IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

CHRIS LOWRY, by, through, and with                                                   PLAINTIFFS
his Mother WENDY CROW;
COLTON DOUGAN, by, through, and with
his Father FRANK DOUGAN and
Mother LEIGH DOUGAN; and
MICHEAL JOSEPH, by, through, and with
his Mother HEIDI JOSEPH

v.                                   No. 5:06CV00262 JLH

WATSON CHAPEL SCHOOL DISTRICT;
CHARLES DANIEL KNIGHT, Watson Chapel
School District Superintendent, in His Individual
and Official Capacities; and WATSON CHAPEL
SCHOOL BOARD PRESIDENT CHARLES DANIEL;
VICE PRESIDENT SANDRA C. BOONE;
SECRETARY DONNIE HARTSFIELD; and
MEMBERS DANNY HOLCOMB; JIM JOHNSON;
MAXINE NELSON; and JOHN TREGLOWN,
in Their Individual Capacities                                                        DEFENDANTS

**OPINION AND ORDER**

This action arises out of discipline imposed on students in the Watson Chapel School District who wore black armbands to protest the district's uniform policy. Plaintiffs Chris Lowry, Colton Dougan, and Micheal Joseph are students at the Watson Chapel School District. They, through their legal representatives Wendy Crow, Frank Dougan, Leigh Dougan, and Heidi Joseph, bring suit under 42 U.S.C. § 1983 against the Watson Chapel School District, the district's superintendent Charles Daniel Knight in his individual and official capacities, and the district's school board members Charles Daniel, Sandra C. Boone, Donnie Hartsfield, Danny Holcomb, Jim Johnson, Maxine Nelson, and John Treglown in their individual capacities for violations of the student plaintiffs' rights under the First Amendment. The plaintiffs have filed a motion requesting a preliminary injunction. In their motion, they request that the Court enjoin the defendants from disciplining the student plaintiffs

in any way for wearing the black armbands to school, order defendants to abate and expunge from all student records the discipline of the student plaintiffs for wearing black armbands, enjoin defendants from taking or enforcing the remainder of any disciplinary action against the student plaintiffs on account of their armband protest, and enjoin defendants from using the discipline to exclude the student plaintiffs from participation in school clubs, activities, and other events. The Court held a hearing on the motion on October 19, 2006. The Court now grants a preliminary injunction in this case.

## I.

The Watson Chapel School District adopted a uniform policy in the summer of 2006 for grades 7 through 12. The policy required students to wear a school uniform "while in school, on school buses, and at designated school bus stops, unless directed otherwise by the school principal." The policy stated that "[f]ailure to wear the school uniform is a violation of the student discipline policy with all of the possible disciplinary consequences listed in the student handbook." The policy listed specific styles of shirts and pants to be worn by students at the district as well as the permissible colors for those articles of clothing. The policy also contained provisions for personal adornments:

> 14.  No towel, scarf, bandana, do-rag, shirt, string, chain, jewelry, special button, insignia, label, marking, different-colored stitching, fringe, brad, stud, picture, logo, ribbon, embroidery, initials, monogram, special buckle, or any other form of adornment may be worn on or over any part of the uniform, except the school name, school logo, or school insignia.
>
> 15. Personal jewelry may be worn attached to or hanging on the body, but jewelry may not overlap any part of the uniform.
>
> * * *
>
> 17. Any attempt to defeat the uniformity intended by this policy is prohibited.

The parties stipulated for purposes of the preliminary injunction hearing that the school district had

legitimate educational reasons for adopting the written policy. Hence, the legitimacy of the uniform policy is not presently in dispute.

After the uniform policy was adopted, both Chris Lowry and Colton Dougan wore personal adornments to school that did not cover their uniforms. Lowry wore two necklaces that fit tightly around his neck. One consisted of seashells with a small skull in the middle, while the other was a hemp-like rope with a glass pendant in the middle. Dougan wore everyday to school a white, stretchy rubber bracelet that was about a half-inch wide containing the words "Live Pure: 1 Timothy 4:12." Neither Lowry nor Dougan received discipline for wearing those adornments. Other students have worn black rubber wristbands with the words "Watson Chapel" printed on them. One witness testified that the school sold those wristbands at a pep rally.

Wendy Crow, the mother of Lowry, made black, stretchy armbands approximately one-fourth to one-half inch wide and distributed them to parents and students for the students to wear in protest of the uniform policy. Those armbands were approximately the same width and circumference as the white wristband worn by Dougan and the black wristbands sold by the school. The protest was planned for October 6, 2006, and publicized in the local newspaper. On October 5, teachers at the Watson Chapel High School were instructed to send any students wearing black armbands to the auditorium.

On October 6, 2006, each of the plaintiff students wore the armbands to school, either on the wrist, the forearm, or the bicep. None of the plaintiff students wore the armbands on or over any part of his school uniforms. Each of the plaintiff students was disciplined for wearing the armbands. Lowry already had a previous school uniform violation and was given a one-day suspension for "2nd dress code violation." Dougan did not have any previous violations of the uniform policy and was not suspended but received a disciplinary slip. He is concerned that he is no longer eligible to be a

member of the Beta Club, but that is in dispute. Joseph also did not have any violations of uniform policy but received a one-day suspension for a uniform policy violation.

## II.

A district court has broad discretion to grant or deny a preliminary injunction. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998). In making the determination in this case, the Court considers (1) the threat of irreparable harm to the student plaintiffs; (2) the balance between harm to the student plaintiffs and injury to other interested parties; (3) the likelihood that the student plaintiffs will succeed on the merits; and (4) the public's interest in the issuance of an injunction. *Blue Moon Entm't, LLC v. City of Bates City, Mo.*, 441 F.3d 561, 564 (8th Cir. 2006) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). No factor, by itself, is dispositive. *United Indus. Corp.*, 140 F.3d at 1179. "In essence, the inquiry is an equitable one, requiring that [the Court] consider 'whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 370 (8th Cir. 1991) (quoting *Dataphase*, 640 F.2d at 113).

**A.      Likelihood of Success**

Proof of the necessity of preliminary injunctive relief requires some showing of likelihood of success on the merits, the strength of which may depend upon the relative strength of the other three factors, especially threat of irreparable harm. *Dataphase*, 640 F.2d at 113. The Court then, while attempting to avoid deciding with any degree of certainty who will succeed or not succeed, *see Glenwood Bridge*, 940 F.2d at 371, must engage in some meaningful discussion of the probability that the plaintiffs could succeed on their First Amendment claim.

The plaintiffs have made a sufficient showing of likelihood of success on the merits of their

First Amendment claim to warrant a preliminary injunction. The facts in this case are markedly similar to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969). There, students in the Des Moines School District planned to wear black armbands to protest the Vietnam War. *Id*. at 504, 89 S. Ct. at 735. After the principals of the schools learned of the plan to wear armbands, they adopted a policy that any student wearing an armband to school would be suspended if he refused to remove his armband. *Id*. When students arrived at the schools wearing the armband, they were suspended. *Id*. The Supreme Court held that the suspension of the students violated the students' First Amendment rights. The Eighth Circuit has summarized the holding of *Tinker* and its progeny as follows:

> Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the Constitution does not compel "teachers, parents, and elected school officials to surrender control of the American public school system to public school students." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) (quoting *Tinker*, 393 U .S. at 526, 89 S.Ct. 733 (Black, J., dissenting)). The constitutional rights of public school students "are not automatically coextensive with the rights of adults in other settings," *Fraser*, 478 U.S. at 682, 106 S.Ct. 3159, and a school need not tolerate speech that is inconsistent with its pedagogical mission, even though the government could not suppress that speech outside of the schoolhouse. *See Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (citing *Fraser*, 478 U.S. at 685, 106 S.Ct. 3159); *Poling v. Murphy*, 872 F.2d 757, 762 (6th Cir.1989) ( "Limitations on speech that would be unconstitutional outside the schoolhouse are not necessarily unconstitutional within it."). Therefore, courts must analyze First Amendment violations alleged by students "in light of the special characteristics of the school environment." *Hazelwood*, 484 U.S. at 266, 108 S.Ct. 562 (quoting *Tinker*, 393 U.S. at 506, 89 S.Ct. 733).
>
> Purely individual speech by students constituting "personal expression that happens to occur on the school premises" is subject to a high degree of First Amendment protection. *Hazelwood*, 484 U .S. at 271, 108 S.Ct. 562. However, school officials may restrict even individual student expression that "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school," or that "would substantially interfere with the work of the school or impinge upon the rights of other students." *Tinker*, 393 U.S. at 509, 89 S.Ct. 733 (citations and internal quotation marks omitted).

*Henerey ex rel. Henerey v. City of St. Charles, Sch. Dist.*, 200 F.3d 1128, 1131-32 (8th Cir. 1999).

The defendants argue that *Tinker* is inapplicable here because, unlike the students in *Tinker*, the student plaintiffs were not punished because of the message their armbands conveyed. Rather, the defendants argue that the student plaintiffs were punished because the wearing of the black armbands violated the uniform policy. Because the uniform policy is content neutral, the defendants argue that the "time, place and manner" analysis of *Canady v. Bossier Parish School Board*, 240 F.3d 437 (5th Cir. 2001), should be applied rather than the more demanding *Tinker* analysis. In *Canady*, parents of students argued that the dress code established by the school board violated their children's right to free speech under the First and Fourteenth Amendments. *Id*. at 439. Because the dress code was content neutral, the *Canady* court held that the traditional "time, place and manner" test[1] should applied. *Id*. at 443; *see also Isaacs ex rel. Isaacs v. Bd. of Educ. of Howard County, Md.*, 40 F. Supp. 2d 335, 337-38 (D. Md. 1999).

The defendants' argument is insufficient to show that the plaintiffs have not met their burden of proving a likelihood of success. At least with respect to bands worn around the wrist, the student plaintiffs did not violate the uniform policy. The uniform policy prohibits only those adornments that are worn "on or over any part of the uniform." The undisputed evidence is that the student plaintiffs did not wear the armbands "on or over any part" of their uniforms. Furthermore, the undisputed evidence is that both Lowry and Dougan had not been previously disciplined for wearing personal adornments—including a white, stretchy rubber bracelet—to school that did not cover their

---

[1] Under the "time, place and manner" analysis, a governmental regulation will pass constitutional scrutiny if it "furthers an important or substantial government interest; if the interest is unrelated to the suppression of student expression; and if the incidental restrictions on First Amendment activities are no more than is necessary to facility the interest." *Id*. at 443 (citing *United States v. O'Brien*, 391 U.S 367, 377, 88 S. Ct. 1673, 1679, 20 L. Ed. 2d 672 (1968)).

uniforms. The defendants argue that the black armbands violated paragraph 17 of the policy, which prohibits attempts to defeat the uniformity intended by the policy. However, uniformity is not required in jewelry, and, as noted, the black armbands were not substantially different than other bands worn around the wrist. Moreover, after school officials learned of the planned protest, they instructed teachers to send all students who wore the black armbands to the auditorium. The testimony of the assistant principal of the high school and the principal of the junior high school leaves the distinct impression that the students were disciplined because the black armbands signified a protest, not because they defeated uniformity. The assistant principal of the junior high school testified:

> Q. Why are they not allowed to wear the arm band but they're allowed to wear the others?
>
> A. This was a direct protest against the dress code policy.

The assistant principal of the high school testified: "If the student was protesting and he said, 'Yes, I'm protesting, I'm wearing the arm band around the arm,' then that would be a uniform violation." There is a reasonable likelihood that the student plaintiffs will be able to prove that they were punished for their expression, not for violating the uniform policy. Thus, *Tinker* rather than *Canady* would apply.

Under *Tinker*, the defendants would still have been justified in disciplining the student plaintiffs for wearing the black armbands if the student plaintiffs' expression "materially and substantially interfere[d] with the requirements of appropriate discipline in the operation of the school" or "would [have] substantially interfere[d] with the work of the school." 393 U.S. at 509, 89 S. Ct. at 738 (citations and internal quotation marks omitted). The burden is on the school officials to justify their actions. *Bystrom v. Fridley High Sch., Ind. Sch. Dist. No. 14*, 822 F.2d 747,

755 (8th Cir. 1987). "[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 754 (quoting *Tinker*, 393 U.S. at 508, 89 S. Ct. at 737). The evidence at the preliminary injunction hearing did not show that wearing the black armbands substantially interfered with the work of the school. The plaintiffs have presented sufficient evidence for the Court to conclude, at this preliminary stage, that they can succeed on this issue.

**B.     Threat of Irreparable Harm**

The plaintiffs have shown that they will suffer irreparable harm if a preliminary injunction is not granted. Some of the student plaintiffs desire to exercise their First Amendment rights and wear armbands to protest the uniform policy but cannot do so because of the threat of discipline. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690, 49 L. Ed. 2d 547 (1976); *see also Blue Moon Entm't*, 441 F.3d at 565. The student plaintiffs have also shown that they may suffer continuing injury if the defendants are not enjoined from using the events of October 6 in the school district's progressive discipline policy. There was evidence that a student is not allowed to make up examinations or other work missed while the student is suspended. There also was evidence that the school district follows a progressive discipline policy whereby the severity of the punishment increases with each offense. Hence, if the plaintiff students are disciplined in the future, the discipline of October 6 could cause future discipline to be more severe; and it could cause the students to miss school days, including examinations, that cannot be made up.

**C.     Balance of Harms**

The balance of the harms weighs in favor of granting an injunction. As was stated above, the student plaintiffs would suffer harm not only to their First Amendment rights, but also potential

exposure to progressive discipline should an injunction not be granted. The defendants argue that they would be harmed if an injunction were granted because their authority to enforce the dress policy would be undermined and, as a consequence, their ability to effectively operate the schools. The injunction issued herein will leave the dress policy intact and fully enforceable. The balance of harms favors entry of the injunction.

**D.    Public Interest**

In light of the foregoing, the public interest also favors the granting of an injunction.

## CONCLUSION

The defendants are hereby preliminarily enjoined from disciplining any student who wears a band substantially similar to plaintiffs' Exhibit 13 around the wrist. Defendants are also preliminarily enjoined from using the events of October 6 as a factor in the progressive discipline of Chris Lowry, Colton Dougan, or Micheal Joseph, or otherwise using the events of October 6 to the detriment of those three students until a decision is made on the merits. No bond is required.

IT IS SO ORDERED this 20th day of October, 2006.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE