**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

CHRIS LOWRY, by, through, and with                              PLAINTIFFS
his Mother WENDY CROW;
COLTON DOUGAN, by, through, and with
his Father FRANK DOUGAN and
Mother LEIGH DOUGAN; and
MICHEAL JOSEPH, by, through, and with
his Mother HEIDI JOSEPH

v.                                    No. 5:06CV00262 JLH

WATSON CHAPEL SCHOOL DISTRICT, *et al*.                        DEFENDANTS

<u>**OPINION AND ORDER**</u>

This is a civil rights case brought by students and parents of the Watson Chapel School

District against the school district, the members of the school board, and two of the school

administrators.  The plaintiffs have sued the school board members and the two administrators in

both their individual and official capacities.  The defendants have filed a motion for partial summary

judgment in which they argue that the school board members and administrators are entitled to

qualified immunity on all of the claims against them in their individual capacities.  For the reasons

stated hereinafter, the motion for partial summary judgment is granted in part and denied in part.

**I.**

In 1999 the Arkansas General Assembly adopted an act entitled *The School Uniform*

*Initiative Act*, which amended § 6-18-102 of the Arkansas Code.  The legislature made the following

findings:

> The General Assembly hereby finds and determines that the clothes and footwear
> worn by students in the public schools often preoccupy and distract students from
> their major purpose for being in school, that of becoming educated in math, science,
> English, history, and other subjects.  The General Assembly further finds that student
> competition over clothes and footwear has, in several instances, led to violence and
> injuries during school hours; whereas, in those Arkansas schools that have adopted

school uniforms, disparities in student socioeconomic levels are less obvious and disruptive incidents are less likely to occur.

ARK. CODE ANN. § 6-18-102(a) (1999).  The remainder of the act provided procedures by which a school district could adopt a school uniform policy.[1]

In the spring of 2006, the Watson Chapel School Board implemented a mandatory school uniform policy "to promote equal educational opportunity through economical access to appropriate school clothing and orderly, uniform apparel standards for students."  The policy for the 2007-2008 school year is substantially the same but states that its purpose "is to promote a wholesome school climate, security, equal educational opportunity, and economical access to appropriate school clothing through orderly, uniform apparel standards for students."  A copy of the policy for the 2006-2007 school year is attached to this opinion as Exhibit A.  A copy of the policy for the 2007-2008 school year is attached to this opinion as Exhibit B.

A number of students and parents oppose the policy, the way it is enforced, or both.  Some of those students and parents organized a protest of the school uniform policy and its enforcement.  On September 30, 2006, they handed out black armbands to be worn to school in protest of the policy on October 6, 2006.  When October 6 came, several students wore black armbands to the junior and senior high schools.  The armbands were not worn over any part of the school uniform.  The students who wore the armbands were disciplined, allegedly for violating the school uniform

---

[1] Some of the historical background to legislation of this sort is described in Amy Mitchell Wilson, *Public School Dress Codes: The Constitutional Debate*, 1998 B.Y.U. EDUC. & L.J. 147.  In his 1996 State of the Union Address, then-President Clinton said, "I challenge all of our schools to teach character education, to teach good values and good citizenship.  And if it means that teenagers will stop killing each other over designer jackets, then our public schools should be able to require their students to wear school uniforms."  *See* President Bill Clinton, State of the Union Address (Jan. 23, 1996), *available at* http://clinton2.nara.gov/WH/New/other/sotu.html.

policy.  However, the school uniform policy allows students to wear jewelry, including wristbands, so long as the jewelry is not worn over any part of the school uniform.

One student, Chris Lowry, distributed a flyer criticizing the school uniform policy.  Lowry did not obtain approval of the principal before distributing the flyer, as required by a different policy of the Watson Chapel School District, and he was also disciplined for that violation of the school policy.

On October 10, 2006, the plaintiffs commenced this action by filing a one-count complaint in which the only claim for relief related to the discipline imposed for wearing black armbands on October 6, and they simultaneously moved for a preliminary injunction to stop all discipline relating to the black armbands.  After an evidentiary hearing, the Court granted the motion and preliminarily enjoined the defendants from disciplining any student for wearing an armband substantially similar to the armband worn by the plaintiffs on October 6.

On February 22, 2007, the plaintiffs amended their complaint.  The amended complaint alleges four claims for relief: that the defendants violated the freedom of expression guaranteed by the First and Fourteenth Amendments when they disciplined students who wore black armbands to school on October 6; that the school uniform policy on its face violates the freedom of expression guaranteed by the First and Fourteenth Amendments in that it is a prior restraint on student speech; that the manner in which the school uniform policy is enforced violates the right of the students to due process; and that the student literature policy, which prohibits distribution of printed matter without prior approval by the principal, violates the freedom of expression guaranteed by the First and Fourteenth Amendments.  The amended complaint seeks declaratory relief, injunctive relief, nominal damages, punitive damages, and attorneys' fees.

The defendants have filed a motion for partial summary judgment in which they argue that they are qualifiedly immune from the claims against them in their individual capacities.

## II.

Government officials performing discretionary functions are immune from suit for civil damages in a § 1983 action unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982). In ruling on qualified immunity, the threshold question is whether, taken in the light most favorable to the party asserting the defense, the facts alleged establish the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). "This must be the initial inquiry." *Id*. If a constitutional violation could be made out, the next step is to ask whether the right was clearly established. This inquiry must be undertaken on a very specific level in light of the particular context of the case. *Id*. A right is "clearly established" when the "contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 202 (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987)). Because qualified immunity is immunity from suit, not merely immunity from damages, the issue must be resolved at the earliest stage possible. *Id*. at 200-01. Courts are required to address the merits of the constitutional issue first and may not "skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of this case." *Id*. at 201.

## III.

**A.    THE CONSTITUTIONALITY OF THE SCHOOL UNIFORM POLICY**

Neither the Supreme Court of the United States nor the Eighth Circuit has decided a case making a facial challenge to a school uniform policy or dress code on First Amendment grounds. However, the Sixth Circuit has addressed a similar though not identical school policy and upheld it against a First Amendment challenge in *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005), and the Fifth Circuit has done so in *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir. 2001).

In *Blau*, the Sixth Circuit first held that the plaintiff had no claim to First Amendment protection because she had nothing particular that she wanted to communicate but only wanted to wear clothes that look nice on her and in which she feels good. *Blau*, 401 F.3d at 388-90. The testimony of the students here was similar. When Michael Joseph was asked what it was about the school uniform policy that he did not like, he said, "Just everybody has got to wear the same uniforms, we got to keep our shirts tucked in, we got to wear the IDs, and I just don't feel like keeping my shirt tucked in all day – it's uncomfortable. I just don't like it." In response to the same question, Chris Lowry testified, "I just don't like having to go to school and look like everybody else. I like to be different from everybody else and express myself how I would like." Colton Dougan testified that he had no disagreement with the policy but did object to the way in which the policy was enforced. Thus, as to the facial challenge to the school uniform policy, the plaintiffs here have no more claim to First Amendment protection than did the plaintiff in *Blau*.

However, because the overbreadth doctrine sometimes permits a plaintiff to seek First Amendment protection on behalf of others, the court must address the larger issue of whether the school uniform policy violates the First Amendment. *Blau*, 401 F.3d at 390-91. Citing *United States*

*v. O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968), the court in *Blau* said that a restriction on expressive conduct will be upheld if (1) it is unrelated to the suppression of expression, (2) it furthers an important or substantial government interest, and (3) it does not burden substantially more speech than necessary to further the interest. *Id*. at 391.  The court upheld the dress code at issue, saying that it "does not regulate any particular viewpoint but merely regulates the types of clothes that students may wear"; "the dress code furthers important government interests", including "bridging socio-economic gaps between families within the school district, focusing attention on learning, increasing school unity and pride, enhancing school safety, promoting good behavior, reducing discipline problems, improving test scores, improving children's self-respect and self-esteem, helping to eliminate stereotypes and producing a cost savings for families"; and because the dress code does not "suppress substantially more expressive conduct than is necessary to further its interests." *Id*. at 391-92; *see also Littlefield*, 268 F.3d at 286-87.  These government interests are substantially the same as those invoked by the Arkansas General Assembly and the Watson Chapel School Board.

In *Blau*, the court stated, "In the First Amendment arena and other arenas as well, the Supreme Court has frequently emphasized that public schools have considerable latitude in fashioning rules that further their educational mission and in developing a reasonable fit between the ends and means of their policies. *Blau*, 401 F.3d at 393 (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 n.6, 108 S. Ct. 562, 571 n.6, 98 L. Ed. 2d 592 (1988)).  In *Henerey ex rel. Henerey v. City of St. Charles*, 200 F.3d 1128 (8th Cir. 1999), and *Bystrom v. Fridley High Sch. Indep. Sch. Dist.*, 822 F.2d 747 (8th Cir. 1987), the Eighth Circuit made similar pronouncements regarding the manner in which federal courts should review First Amendment challenges to policies of a local school board.  *See Henerey*, 200 F.3d at 1136 (education is primarily the responsibility of parents,

6

teachers, and school officials, not federal judges); *Bystrom*, 822 F.2d at 755 (whether to adopt guidelines to restrict student speech is not a judicial question but one for school boards and administrators).  No dress code was at issue in either of those cases, nor did either of them cite *O'Brien*, but this Court nonetheless has concluded that the Eighth Circuit, in ruling on a claim that a school dress code on its face violates the freedom of speech guaranteed by the First and Fourteenth Amendments, likely would adopt an approach similar to *Blau* and *Littlefield*.

The plaintiffs cite as contrary authority *Bishop v. Colaw*, 450 F.2d 1069 (8th Cir. 1971), which addressed the constitutionality of a high school policy that required the hair of male students to be neatly trimmed around the ears and the back of the neck, to be no longer than the top of the collar on a regular dress or sport shirt, to leave the eyebrows visible, and to cover no part of the ear.[2] A male student and his parents brought an action alleging that the regulation violated the student's First Amendment right to symbolic expression, his Fourteenth Amendment right to equal protection, his Ninth and Fourteenth Amendment rights to govern his personal appearance, and his parents' Ninth and Fourteenth Amendment rights to govern the raising of their family.  With respect to the First Amendment claim, the court said:

> We deem the First Amendment contention to be without merit in the context of this case, since the record contains no evidence suggesting that Stephen's hairstyle represented a symbolic expression of any kind.  The appellants concede that Stephen never considered his hairstyle to be symbolic of any idea.  They argue, however, that a "[nonconforming hairstyle] need not symbolize anything at all . . . to be a constitutionally protected expression."  We cannot accept this unusually broad reading of the First Amendment.  Since all conduct cannot be labeled speech even when "the [actor] intends thereby to express an idea," [citing *O'Brien*], certainly conduct not intended to express an idea cannot be afforded protection as speech.

---

[2] The Watson Chapel School District policy at issue here does not regulate hair length.

*Bishop*, 450 F.2d at 1074.  Insofar as *Bishop* is on point, it is against the plaintiffs because it held that the hairstyle regulation did not violate any First Amendment right.

Although *Bishop* held that the student's choice of hairstyle was not protected by the First Amendment, it held, following *Griswold v. Connecticut*, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965), that rights other than those enumerated in the Constitution are protected by the Constitution and that those unenumerated rights include "the freedom to govern one's personal appearance."  *Bishop*, 450 F.2d at 1075.  Here, the plaintiffs have added that the school uniform policy violates the First and Fourteenth Amendments to the Constitution because it "is a prior restraint on pure student speech, bans all pure student speech, is a content-based restriction on speech, and coerces speech[.]"  Amended Complaint, p. 19.  The Court does not understand the amended complaint to allege or the plaintiffs' brief to argue that the school uniform policy violates an unenumerated right; instead, plaintiffs invoke the First Amendment as applied to the states through the Fourteenth Amendment.

Although the plaintiffs have not argued that Watson Chapel's school uniform policy violates some unenumerated right, the Court notes that regulating a student's haircut is different from requiring a school uniform.  The Watson Chapel school uniform must be worn at school approximately seven hours per day, five days per week, for approximately nine months of the year. During the remaining seventeen hours of the day, on weekends, during holidays, and during summers – whenever the student is away from school – the student is absolutely free of the school uniform policy.  The school uniform policy has no impact on what students may wear other than at school during school hours.  On the other hand, a hairstyle regulation such as the one at issue in *Bishop* would have an impact on a student beyond school hours and outside of school property.  At night, or on weekends, and during holidays, a student's hairstyle would still be affected by the school

8

policy; and it would be affected to some extent even during the summers because of the length of time it takes hair to grow.  In *Bystrom*, the court noted that the regulation by school authorities of student conduct on school property raises quite different issues than a claim by school authorities to regulate student conduct off campus.  *Bystrom*, 822 F.2d at 750.  So, this Court is not convinced that the Eighth Circuit would extend *Bishop* to the facts of this case.

Plaintiffs attempt to distinguish *Blau* on the ground that the regulation in *Blau* did not prohibit all symbols and logos but, instead, limited the size of non-school logos, whereas, the Watson Chapel policy prohibits all logos other than school logos.  Plaintiffs conclude from this that the regulation in *Blau* was content neutral whereas the Watson Chapel policy is not.  Another district court has said that a school uniform policy is content neutral even if it prohibits logos other than that of the school.  *Long v. Bd. of Educ. of Jefferson County, Ky.*, 121 F. Supp. 2d 621, 625 n.5 (W.D. Ky. 2000), *aff'd* 21 Fed. Appx. 252 (6th Cir. 2001).  Plaintiffs have cited no authority to the contrary. In *Long*, the court stated, "the court finds nothing in the evidence of this case from which a reasonable jury might infer that Defendant's real intent was to suppress Plaintiffs' opinions."  *Id*. Likewise, no evidence has been presented in this case that the real intent in adopting the school uniform policy was to suppress opinion.  To put it another way, no evidence has been presented that the stated purposes of the School Uniform Initiative Act or the Watson Chapel School uniform policy were pretextual.

The Watson Chapel school uniform policy does not regulate any particular viewpoint but merely regulates the types of clothes that students may wear; it is intended to further important government interests, including bridging socioeconomic gaps between families in the school district, focusing attention on learning rather than on fashion, and improving school security; and it does not suppress substantially more expressive conduct than necessary to further these interests.

The restrictions in the school uniform policy apply only during school hours; students remain free to wear what they want outside of school. Even during school hours, the school uniform policy does not foreclose all means of individual expression. One provision of the school uniform policy states that students may wear jewelry that does not overlap any part of the uniform. That provision has been construed to allow bracelets and wristbands, including bracelets and wristbands with messages written on them. At the preliminary injunction hearing, part of the plaintiffs' proof that the black armbands were suppressed because of the viewpoint that they expressed was that students have been allowed to express other viewpoints on substantially similar wristbands. Chris Lowry testified that he wears a blue armband to school, that the purpose of the blue armband is to send the message that freedom cannot protect itself, and that he has not been disciplined for wearing it. Likewise, Colton Dougan wears a bracelet that says, "Live Pure: I Timothy 4:12," and he has not been disciplined. Necklaces that do not overlap the school uniform are permitted, and they also could be used to express ideas in the same way that Lowry uses his blue armband and Dougan his bracelet. In addition, according to the undisputed testimony of the superintendent, Charles Daniel Knight, in his deposition, the school district sponsors a student newspaper that is open to guest editorials by students. And since the constitutional issue right at stake is freedom of speech, it should be noted that nothing in the school uniform policy prohibits students from speaking to one another, to teachers, and to administrators, before and after classes, in the hallways, during classroom discussions, during extracurricular activities, and the like. The student handbook prohibits lying, cheating, verbal abuse, name-calling, racially derogatory remarks, and sexual harassment, but the plaintiffs do not complain about any of those regulations, and the student handbook does not otherwise prohibit students from saying what they think. Thus, "[t]he uniform requirement does not bar the important 'personal inter-communication among students' necessary to an effective

10

educational process." *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 443 (5th Cir. 2001) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512, 89 S. Ct. 733, 21 L. Ed. 2d 73 (1969)).

This Court believes that the Eighth Circuit, when reviewing a First Amendment challenge to a school uniform policy, would use an analysis much like that used in *Blau* and *Littlefield*. The Watson Chapel school uniform policy would survive scrutiny under *Blau* and *Littlefield*.

In addition to arguing that the school uniform policy violates the First Amendment, the plaintiffs argue that it is void for vagueness. However, the policy actually is quite clear and specific. It gives reasonable notice of what is prohibited and therefore is not void for vagueness. *Brandt v. Bd. of Ed. of City of Chicago*, 420 F. Supp. 2d 921, 939 (N.D. Ill. 2006). In stating why they believe that the policy is vague, the plaintiffs point to the manner in which it has been enforced, but that is a separate issue.

In the opinion of this Court, the school uniform policy adopted by the Watson Chapel School District contravenes no provision of the United States Constitution. In the alternative, if the school uniform policy is unconstitutional, the law so stating was not clearly established when the school board members adopted it. This Court cannot say that a reasonable school board member would have known that the school uniform policy is unconstitutional.

B.     THE STUDENT LITERATURE REVIEW POLICY

The student literature review policy in effect during the 2006-2007 school year is a bit different. It is a one-line policy stating that "distribution of petitions or other printed matter not approved in advance by the principal" is prohibited. Although neither party has cited a case directly on point, nor has the Court found one, the two Eighth Circuit cases addressing school regulations that required prior approval of literature to be distributed on school property suggest that some

guidance must be given to the administrator who is to conduct the review and some limit must be placed on the time within which he has to act.  In *Henerey*, the court considered and upheld a school regulation that required prior approval of certain materials but specifically noted that the guidance given to the administrator who was to conduct the review was sufficiently specific and provided that administrator had "a reasonable time period – twenty-four hours – to evaluate materials."  *Henerey*, 200 F.3d at 1135.  Likewise, in *Bystrom*, the court reviewed regulations governing literature to be distributed on a school campus, found all but one of the regulations constitutional, and overruled an objection that the regulations failed to specify a time within which the superintendent must respond on appeal by construing the rules to require the superintendent to make a decision within three days. *Bystrom*, 822 F.2d at 754-55.  Neither of these cases is directly on point because neither addressed a rule like the one here, which gives no guidance to the principal as to what printed matter should be approved for distribution and provides no time limit within which the principal must act. However, it is logical to infer from *Henerey* and *Bystrom* that the Eighth Circuit probably would require some guidelines that the administration must follow in determining whether to approve of printed matter that is to be distributed on campus and some time limit within which the administration must act.

That is not to say, however, that when the Watson Chapel School Board adopted the student literature review policy in effect for the 2006-2007 school year the school board members violated clearly established law.  Neither *Henerey*, *Bystrom*, nor any other case cited by the plaintiffs expressly holds that a policy requiring prior approval of literature to be distributed on school grounds must provide guidance to the administrator who grants or withholds the approval and a time limit within which he must act.  But even if the specific action in question has not previously been held

unlawful, qualified immunity may still be denied if in the light of preexisting law the unlawfulness is apparent.  *Anderson*, 483 U.S. at 640, 107 S. Ct. at 3039.

In 1988 the Supreme Court rejected the proposition that school officials could exercise prepublication restraint with respect to school-approved publications only pursuant to specific written regulations and then stated, "We need not now decide whether such regulations are required before school officials may censor publications not sponsored by the school that students seek to distribute on school grounds."  *Kuhlmeier*, 484 U.S. at 273 n.6, 108 S. Ct. at 571 n.6.  Thus, in *Kuhlmeier* the Supreme Court expressly left undecided the issue presented here and has not addressed that issue since.  If the law on this issue were so clear that school board members should know of it, why would the Supreme Court make such a point of withholding a decision?  If it were clearly established law that, in the absence of specific regulations or guidelines, school officials may not censor publications that students wish to distribute on campus when those publications are not school-sponsored, the court could have so noted in explaining the decision in *Kuhlmeier*, or the court could have been silent on the issue precisely because it was clearly established and therefore needed no comment; but for the court to call attention to the fact that it was withholding a decision on that issue suggests that the court did not regard the law on that issue as clearly established.  The court expressly stated that regulations are not required before a school may restrain school-sponsored publications and expressly left open the question of whether regulations are required before a school may restrain publications that it does not sponsor.  It is clearly established that "the prior restraint of speech within secondary schools is not per se unconstitutional."  *Henerey*, 200 F.3d at 1134; *see also Bystrom*, 822 F.2d at 750.  It is not so clear, however, when prior restraints are constitutional and when they are not.

While surmising that the Eighth Circuit likely would hold that Watson Chapel's student literature review policy is unconstitutional, this Court cannot find that the law was so clearly established that school board members should have known that it was unconstitutional.  The school board members are entitled to qualified immunity on this issue.

**C.      THE CONSTITUTIONALITY OF THE DISCIPLINE IMPOSED BY KNIGHT AND WEBB**

The other two defendants are Charles Daniel Knight and Henry Webb.  Knight was the superintendent of students and Webb the principal of the junior high school at the time of the events in question.  The plaintiffs allege that Knight and Webb enforced the policies in an unconstitutional manner.  The plaintiffs raise a variety of concerns, the most serious of which is that Knight and Webb used the school uniform policy as a pretext to punish students who wore the black armbands as a means of expressing disagreement with school policy.  The Court previously heard evidence that some students wore a black armband to school as a means of protest against the school uniform policy and that they were disciplined for doing so.  Although the defendants contend that the students were disciplined because the armbands violated the school uniform policy, there is evidence to the contrary.  Knight and Webb have permitted students to wear bracelets and wristbands hardly distinguishable from the black armbands at issue.  When asked at the preliminary injunction hearing why students were not allowed to wear the black armbands on October 6 but were allowed to wear the other bracelets and wristbands, Webb testified, "[t]his was a direct protest against the school dress policy."  Likewise, Webb testified in his deposition that he could not recall that any student has been disciplined for violating the student literature review policy other than Chris Lowry, who was disciplined for distributing the protest flyer on October 6, 2006.

Viewing the evidence in the light most favorable to the plaintiffs, a reasonable person could find that the black armbands did not violate the school uniform policy, which permitted wristbands

and jewelry; that the students who wore the black armbands were disciplined because the armbands were used to express disagreement with school policy; and that Lowry was additionally disciplined because the flyer expressed disagreement with school policy.  In other words, there is evidence that discipline was imposed to suppress a particular viewpoint.  Absent evidence that wearing the armbands or distributing the flyers would substantially interfere with the work of the school, the right of students to engage in such conduct was clearly established in 1969.[3]  *Tinker*, 393 U.S. at 514, 89 S. Ct. at 740; *see also Bystrom*, 822 F.2d at 755.  Because there is a genuine issue of material fact as to whether Knight and Webb imposed discipline to suppress a particular viewpoint, as distinct from simply enforcing policy without regard to viewpoint, the Court cannot grant summary judgment on the issue of qualified immunity with respect to the claims against them in their individual capacities.

As to the board members, no evidence has been presented that any member of the school board participated in the disciplinary decisions at issue, nor have the plaintiffs specifically alleged or specifically argued that any board members participated in these disciplinary decisions.  Board member Danny Holcomb testified, "All I do is set the policy, I don't enforce it."  In the absence of any specific allegation, argument, or evidence that the board members were involved in disciplinary decisions, the Court has construed plaintiffs' claims about the manner of enforcement not to be directed at the board members in their individual capacities.

---

[3] While "the mode of analysis set forth in *Tinker* is not absolute," *Morse v. Frederick*, 127 S. Ct. 2618, 2627 (2007), *Tinker* has not been reversed and therefore still controls on the present issue, because the facts, viewed in the light most favorable to the plaintiffs, cannot be distinguished from those in *Tinker* in any legally significant way.

**CONCLUSION**

The claims against Charles Daniels, Sandra C. Boone, Donnie Hartsfield, Danny Holcomb, Jim Johnson, Maxine Nelson, and John Treglown in their individual capacities are hereby dismissed because those defendants are qualifiedly immune from the action brought by these plaintiffs for money damages.  Charles Daniel Knight and Henry Webb are not, however, entitled to qualified immunity for the claims against them in their individual capacities.

The defendants' motion for partial summary judgment is granted in part and denied in part. Document #37.  The claims against Charles Daniels, Sandra C. Boone, Donnie Hartsfield, Danny Holcomb, Jim Johnson, Maxine Nelson, and John Treglown in their individual capacities are hereby dismissed.  The motion is denied as to Charles Daniel Knight and Henry Webb.

IT IS SO ORDERED this 22nd day of August, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

## STUDENT APPAREL

1. Students are required to wear the school uniform while in school, on school buses, and at designated school bus stops, unless directed otherwise by the school principal.
2. The intent of this rule is to promote equal educational opportunity through economical access to appropriate school clothing and orderly, uniform apparel standards for students.
3. Principals shall strictly enforce this policy with progressive disciplinary consequences.
4. Principals shall not allow individual exceptions—even for short periods of time—on any basis other than minimal variance to accommodate a documented handicapping condition.
5. Principals may permit group exceptions only for special school activities—such as JROTC uniform day or an occasional special apparel theme day.
   A. Any theme day special apparel must be freely available to all students.
   B. No school day shall be declared simply uniform-free.
6. Students are not required to wear the school uniform to after-school sporting events or similar activities outside the school day.
7. The uniform rules shall be strictly enforced by principals and teachers at all times and in all school settings, allowing no student to enter class out of uniform. Schools shall maintain a supply of uniforms for emergencies and new students.
8. Failure to wear the school uniform is a violation of the student discipline policy with all of the possible disciplinary consequences listed in the student handbook.
9. School uniform means
   A. In grades 7-12, polo style shirt with placket, 2 or 3 buttons, long or short sleeves, and ribbed-knit collar in the color **hunter green only for the junior high and white only for the senior high school**
   B. In grades K-6, polo style shirt with long or short sleeves, placket, 2 or 3 buttons, and ribbed-knit collar, or oxford style shirt with collar and long or short sleeves, in white, light blue, or burgundy
   C. pants, shorts, jumper, skirt, capris, or skorts with plain or pleated front
      a  pants, capris, and shorts must be straight-legged, with or without cuffs
      b  **pants, capris, and shorts must have belt loops in grades 7-12**
      c  colors for elementary—khaki or navy blue
      d  color for junior and senior high—khaki only
      e  **no cargo pants, stretch pants, sweatpants, wind pants, or denim of any color**
   D. solid color black or brown belt with pants, capris, or shorts in grades 7-12
   E. solid color black or brown belt with any garment that has belt loops
   F. student identification card issued by the school office
      a  worn where clearly visible at all times
      b  either pinned to the uniform or on a lanyard
      c  required as soon as issued by the office
      d  in all schools except Edgewood (Grades K-1).


EXHIBIT
A

G. If an outer garment is needed for warmth, the uniform may include a solid color sweatshirt or sweater in black, golden yellow, or the shirt color designated for the school attended

   a  with or without school insignia, such as the school name and mascot, but with no other words, names, logos, or markings

   b  with or without an attached hood.

H. If an undershirt is needed for warmth, the uniform may include a plain white tee shirt or plain white turtle-neck with no markings or logos

   a  The tee or turtle-neck may be visible at the neck above the placket of the polo shirt.

   b  The tee or turtle-neck may not be visible below the sleeve of the polo shirt.

10. The school uniform shall be kept in good repair with

  A. no frayed hems or seams

  B. no splits other than manufactured splits

  C. no missing buttons, belt loops, or other parts.

11. The school uniform must fit with

  **A. no sagging**

  **B. no skin-tightness**

  **C. no plunging neckline**

  **D. no transparency**

  E. full body coverage from the shirt placket to a dollar bill's width above the knee

  F. shirt-tails long enough to remain tucked in during all physical activity.

12. The school uniform must be worn with waistbands fastened, shirttails tucked in, and belts buckled.

13. No hat or other head covering is permitted, except that hoods attached to an approved outer garment may be pulled up on the head outside for warmth; hoods may not be worn pulled up on the head inside buildings.

14. No towel, scarf, bandana, do-rag, shirt, string, chain, jewelry, special button, insignia, label, marking, different-colored stitching, fringe, brad, stud, picture, logo, ribbon, embroidery, initials, monogram, special buckle, or any other form of adornment may be worn on or over any part of the uniform, except the school name, school logo, or school insignia.

15. Personal jewelry may be worn attached to or hanging on the body, but jewelry may not overlap any part of the uniform.  Sunglasses may be worn as eye protection outside, but sunglasses may not be visible inside the buildings.

16. Coats and jackets may be worn over the uniform, but

  A. they must be unzipped or unbuttoned inside the buildings so that the uniform is fully visible in the front.

  B. No pullover coats or jackets which do not open fully in the front may be worn over the uniform in the buildings.

17. Any attempt to defeat the uniformity intended by this policy is prohibited.

Dear Watson Chapel Students and Parents:

Here is the new uniform policy for the coming school year. It will be strictly enforced from the first day of school—no exceptions. Please take the time to plan your student's clothing before school starts in August. Our goal is to have school with minimum distractions from learning. The policy makes changes from the previous policy in areas where some of you may have expressed concern. Please read the policy carefully. Call my office and ask Ms. Melton or Mr. Lincoln if you need any clarification.

On behalf of our Board of Education, thanks to all of you who responded to the survey and worked on the advisory committee.

Sincerely,

Charles D. Knight
Superintendent

## STUDENT APPAREL

1. Students are required to wear the school uniform and comply with this policy on student apparel while in school, on school buses, and at designated school bus stops, unless directed otherwise by the school principal. Students are not required to wear the school uniform to after-school sporting events or other activities outside the school day.
2. The intent of this policy is to promote a wholesome school climate, security, equal educational opportunity, and economical access to appropriate school clothing through orderly, uniform apparel standards for students.
3. Failure to abide by this apparel policy is a violation of the student discipline policy with all of the possible disciplinary consequences listed in the student handbook.
4. Principals and teachers shall employ progressive disciplinary consequences to strictly enforce this policy, allowing no student violating the policy to remain in class.
5. Principals shall not allow individual exceptions—even for short periods of time—on any basis other than the minimal variance necessary to accommodate a documented handicapping condition.
6. With the Superintendent's approval, Principals may permit group exceptions only for special school activities such as JROTC uniform day or an occasional special apparel theme day
   A. Any special apparel must be freely available to all students
   B. No school day shall be declared simply uniform-free with no particular apparel required
   C. No student shall be punished for wearing the uniform on a special apparel theme day.
7. Schools shall maintain a supply of uniforms for emergencies and new students.
8. The "school uniform" means:
   A. in grades 7-12, polo style shirt with placket, 2 to 4 buttons, long or short sleeves, and ribbed-knit collar in the color hunter green only for the junior high and white only for the senior high school
   B. in grades K-6, polo style shirt with long or short sleeves, placket, 2 to 4 buttons, and ribbed-knit collar, or oxford style shirt with collar and long or short sleeves, in white, light blue, or burgundy
   C. pants, shorts, jumper, skirt, capris, or skorts with plain or pleated front
      a   pants, capris, and shorts must be straight-legged, with or without cuffs
      b   pants, capris, and shorts must have belt loops in grades 7-12
      c   colors for elementary—khaki or navy blue
      d   color for junior and senior high—khaki only
      e   no cargo pants, stretch pants, sweatpants, wind pants, or denim of any color
      f   manufactured brads are permitted at stress points only
      g   no more than 2 pockets in front and 2 pockets in back
      h   pockets must be just below the belt line
      i   back pockets may have button-down flaps


EXHIBIT
B

   j    no cellphone pockets are permitted
   k    either patch pockets or inside pockets are permitted
   D.  solid color black or brown leather or leather-look belt with pants, capris, or shorts in grades 7-12
   E.  solid color black or brown leather or leather-look belt with any garment that has belt loops
   F.  in all schools except Edgewood (Grades K-1), student identification card issued by the school office
       on a lanyard issued by the school office worn around the neck and visible in the front
   G.  If an undershirt is needed for warmth, the uniform may include a plain white tee shirt or plain
       white turtle-neck with no markings or logos
       a    The tee or turtle-neck may be visible at the neck above the placket of the polo shirt
       b    The tee or turtle-neck may not be visible below the sleeve of the polo shirt
   H.  Any apparel that varies from this description of the school uniform is prohibited, whether or not the
       particular variation is specifically prohibited above.
9.  The school uniform shall be kept in good repair with
   A.  no frayed hems or seams
   B.  no holes or splits other than manufactured splits
   C.  no missing buttons, belt loops, or other parts.
10.  The school uniform must fit with
   A.  no sagging
   B.  no skin-tightness
   C.  no plunging neckline
   D.  no transparency
   E.  full body coverage from the shirt placket to a dollar bill's width above the knee
   F.  the bottom button buttoned if the shirt has 4 buttons
   G.  shirt-tails long enough to remain tucked in during all physical activity.
11.  The school uniform must be worn with waistbands fastened, shirttails tucked in, belts in belt loops and
    fitted snugly.
12.  No towel, scarf, bandana, do-rag, shirt, string, chain, jewelry, special button, insignia, label, marking,
    different-colored stitching, fringe, decorative brads, stud, picture, painting, airbrush design, logo,
    ribbon, embroidery, initials, monogram, special buckle, or any other form of adornment may be worn
    on or over any part of the uniform.
13.  Personal jewelry may be worn attached to or hanging on the body, but jewelry may not overlap any
    part of the uniform.
14.  Sunglasses may be worn as eye protection outside, but sunglasses may not be visible inside the
    buildings.
15.  Coats, jackets, hoodies, and sweaters may be worn over the uniform, but they must have a full length
    opening in the front; no pullover outer garments such as sweatshirts or hoodies which do not open
    fully in the front may be worn over the uniform
   A.  outer garments must be unfastened full length inside the buildings so that the uniform is visible in
       the front
   B.  hoodies must be black, golden yellow, or the shirt color designated for the school
       a    school insignia are permitted on hoodies
       b    no other markings are permitted
16.  No hat or other head covering is permitted, except that hoods attached to coats, jackets, hoodies, or
    sweaters may be pulled up on the head outside the buildings for warmth; hoods may not be worn
    pulled up on the head inside buildings.
17.  House shoes are not permitted.
18.  Backpacks must be clear or mesh.
19.  The principal has complete authority to regulate graduation apparel.
20.  Any attempt to use apparel to defeat the uniformity intended by this policy is prohibited.

2007-08

\* changes from 2006-07
policy underlined

Dear Watson Chapel Students and Parents:

Here is the new uniform policy for the coming school year. It will be strictly enforced from the first day of school—no exceptions. Please take the time to plan your student's clothing before school starts in August. Our goal is to have school with minimum distractions from learning. The policy makes changes from the previous policy in areas where some of you may have expressed concern. Please read the policy carefully. Call my office and ask Ms. Melton or Mr. Lincoln if you need any clarification.

On behalf of our Board of Education, thanks to all of you who responded to the survey and worked on the advisory committee.

Sincerely,

Charles D. Knight
Superintendent

## STUDENT APPAREL

1. Students are required to wear the school uniform and comply with this policy on student apparel while in school, on school buses, and at designated school bus stops, unless directed otherwise by the school principal. Students are not required to wear the school uniform to after-school sporting events or other activities outside the school day.
2. The intent of this policy is to promote a wholesome school climate, security, equal educational opportunity, and economical access to appropriate school clothing through orderly, uniform apparel standards for students.
3. Failure to abide by this apparel policy is a violation of the student discipline policy with all of the possible disciplinary consequences listed in the student handbook.
4. Principals and teachers shall employ progressive disciplinary consequences to strictly enforce this policy, allowing no student violating the policy to remain in class.
5. Principals shall not allow individual exceptions—even for short periods of time—on any basis other than the minimal variance necessary to accommodate a documented handicapping condition.
6. With the Superintendent's approval, Principals may permit group exceptions only for special school activities such as JROTC uniform day or an occasional special apparel theme day
   A. Any special apparel must be freely available to all students
   B. No school day shall be declared simply uniform-free with no particular apparel required
   C. No student shall be punished for wearing the uniform on a special apparel theme day.
7. Schools shall maintain a supply of uniforms for emergencies and new students.
8. The "school uniform" means:
   A. In grades 7-12, polo style shirt with placket, 2 to 4 buttons, long or short sleeves, and ribbed-knit collar in the color hunter green only for the junior high and white only for the senior high school
   B. In grades K-6, polo style shirt with long or short sleeves, placket, 2 to 4 buttons, and ribbed-knit collar, or oxford style shirt with collar and long or short sleeves, in white, light blue, or burgundy
   C. pants, shorts, jumper, skirt, capris, or skorts with plain or pleated front
      a  pants, capris, and shorts must be straight-legged, with or without cuffs
      b  pants, capris, and shorts must have belt loops in grades 7-12
      c  colors for elementary—khaki or navy blue
      d  color for junior and senior high—khaki only
      e  no cargo pants, stretch pants, sweatpants, wind pants, or denim of any color
      f  manufactured brads are permitted at stress points only
      g  no more than 2 pockets in front and 2 pockets in back
      h  pockets must be just below the belt line
      i  back pockets may have button-down flaps

    j  no cellphone pockets are permitted
    k  either patch pockets or inside pockets are permitted
- D. solid color black or brown leather or leather-look belt with pants, capris, or shorts in grades 7-12
- E. solid color black or brown leather or leather-look belt with any garment that has belt loops
- F. in all schools except Edgewood (Grades K-1), student identification card issued by the school office on a lanyard issued by the school office worn around the neck and visible in the front
- G. If an undershirt is needed for warmth, the uniform may include a plain white tee shirt or plain white turtle-neck with no markings or logos
  - a  The tee or turtle-neck may be visible at the neck above the placket of the polo shirt
  - b  The tee or turtle-neck may not be visible below the sleeve of the polo shirt
- H. Any apparel that varies from this description of the school uniform is prohibited, whether or not the particular variation is specifically prohibited above.

9. The school uniform shall be kept in good repair with
   - A. no frayed hems or seams
   - B. no holes or splits other than manufactured splits
   - C. no missing buttons, belt loops, or other parts.
10. The school uniform must fit with
    - A. no sagging
    - B. no skin-tightness
    - C. no plunging neckline
    - D. no transparency
    - E. full body coverage from the shirt placket to a dollar bill's width above the knee
    - F. the bottom button buttoned if the shirt has 4 buttons
    - G. shirt-tails long enough to remain tucked in during all physical activity.
11. The school uniform must be worn with waistbands fastened, shirttails tucked in, belts in belt loops and fitted snugly.
12. No towel, scarf, bandana, do-rag, shirt, string, chain, jewelry, special button, insignia, label, marking, different-colored stitching, fringe, decorative brads, stud, picture, painting, airbrush design, logo, ribbon, embroidery, initials, monogram, special buckle, or any other form of adornment may be worn on or over any part of the uniform.
13. Personal jewelry may be worn attached to or hanging on the body, but jewelry may not overlap any part of the uniform.
14. Sunglasses may be worn as eye protection outside, but sunglasses may not be visible inside the buildings.
15. Coats, jackets, hoodies, and sweaters may be worn over the uniform, but they must have a full length opening in the front; no pullover outer garments such as sweatshirts or hoodies which do not open fully in the front may be worn over the uniform
    - A. outer garments must be unfastened full length inside the buildings so that the uniform is visible in the front
    - B. hoodies must be black, golden yellow, or the shirt color designated for the school
      - a  school insignia are permitted on hoodies
      - b  no other markings are permitted
16. No hat or other head covering is permitted, except that hoods attached to coats, jackets, hoodies, or sweaters may be pulled up on the head outside the buildings for warmth; hoods may not be worn pulled up on the head inside buildings.
17. House shoes are not permitted.
18. Backpacks must be clear or mesh.
19. The principal has complete authority to regulate graduation apparel.
20. Any attempt to use apparel to defeat the uniformity intended by this policy is prohibited.